**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| |
|---|
| **M.G., B.Z., J.L., and J.M.** on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>**DARRYL C. TOWNS** in his official capacity as the Chairperson of the Board of Parole, and **DANIEL F. MARTUSCELLO III** in his official capacity as the Acting Commissioner of Department of Corrections and Community Supervision<br><br>Defendant. |

**COMPLAINT**

**CLASS ACTION**

24 Civ. _____

## INTRODUCTION

1.      This class action lawsuit challenges the constitutionality of New York Executive Law § 259-c (14), known as "SARA."[1] SARA imposes a mandatory condition of release on thousands of individuals convicted of sexual offenses prohibiting them from entering all *restaurants*, *stores*, *streets*, *sidewalks*, *parks*, and *parking lots* located within 1,000 feet of the property line of a school at any time and for any purpose. The Department of Corrections and Community Supervision ("DOCCS") also applies SARA to prohibit such individuals from living in all residences and homeless shelters within 1,000 feet of the property line of a school. In urban environments like New York City, where schools are everywhere, this prohibition effectively banishes these individuals from the public square by severely restricting their daily movements

---

[1] Executive Law 259-c (14) is colloquially called "SARA" after the Sexual Assault Reform Act, the package of reforms from which it was enacted.

1

and forcing them into remote, decrepit homeless shelters because they cannot find compliant housing.

2.      SARA is as vague as it is expansive. The law provides little guidance on how the 1,000-foot banishment zone is to be measured. Further, the law is unclear as to the scope of the prohibition for places that are only partially within the banishment zone. For example, does one portion of a park being within 1,000 feet of the property line of a school mean that the whole park is prohibited? P.S. 171 is approximately 400 feet from Central Park on East 103rd Street in Manhattan. Does that, alone, mean that all 840 acres of Central Park are prohibited? Defendants DOCCS and the Parole Board have added to this confusion by constantly shifting their official interpretations of what the law covers and by giving parole officers complete discretion to determine if a violation has occurred. As a result, individuals subject to SARA have no idea where they can walk, commute, or live without fear of reincarceration, and people trying to help them reintegrate back into society by finding jobs or housing cannot effectively provide assistance.

3.      While the ostensible justification for the law is to protect minors in schools from sexual offending, it is blanketly applied to thousands of individuals who have never utilized proximity to a school to commit offenses against minors. SARA's restrictions even apply to people who have never sexually offended against minors and to some who have never even committed offenses of a sexual nature. Additionally, scientific evidence has shown that there is no correlation between geographic restrictions and reducing recidivism as sexual offending overwhelmingly occurs by people known to minors and not strangers.

4.      Plaintiffs M.G., B.Z, J.L., and J.M. are subject to SARA and are effectively banished from urban life. M.G., B.Z., J.L., and J.M. are trying to rebuild their lives after serving years in prison, but SARA continues to destabilize that process and undermine the fundamental

goal of parole which is to ensure that individuals returning into society can rehabilitate themselves. This unconstitutionally vague and expansive law has left them, and thousands of similarly situated individuals, indefinitely homeless or facing housing instability, in constant fear of incarceration, and subject to the arbitrary whims of their parole officers.

5.      The plaintiffs in this action seek declaratory and injunctive relief enjoining defendants from enforcing the unconstitutionally vague, expansive, and unnecessary SARA restriction.

## **NAMED PARTIES**

6.      Plaintiff M.G. is a 52-year-old Black man who resides in a homeless shelter on Wards Island in New York County, NY. He is currently on parole until 2029 and is required to comply with SARA as a condition thereof. Enforcement of this provision prevents him from finding stable housing and from moving about in his community.

7.      Plaintiff B.Z. is a 68-year-old Black man who resides in a homeless shelter in the Bronx, NY. He will be subject to parole for the rest of his life and is required to comply with SARA as a condition thereof. Enforcement of this provision prevents him from finding stable housing.

8.      Plaintiff J.L. is a 61-year-old Latino man who resides in a homeless shelter in the Bronx, NY. He is currently subject to parole until 2035 and is required to comply with SARA as a condition thereof. Enforcement of this provision prevents him from finding stable housing.

9.      Plaintiff J.M. is a 67-year-old Latino man who now resides in Albany, NY. He is currently on parole until 2032 and is required to comply with SARA as a condition thereof. Enforcement of this condition hinders his ability to maintain stable housing and move throughout his community.

10.     Defendant DARRYL C. TOWNS is the Chairperson of the New York State Board of Parole. As Chairperson of the New York State Board of Parole, he is responsible for discretionary release, imposing SARA and all conditions of release on individuals subject to such release, and parole revocations. He is sued in his official capacity.

11.     Defendant DANIEL F. MARTUSCELLO III is the Acting Commissioner of DOCCS. As Acting Commissioner, he is responsible for the administration and operation of DOCCS, including the care, custody, parole and post-release supervision of individuals who are incarcerated and discharged from prison. N.Y. Correction Law ("Corr. L.") §§ 201, 203. He is also charged with the "management and control of persons released on community supervision" and inquiring "into all matters connected with said community supervision."  Corr. L. § 112(2). He is sued in his official capacity.

## FACTS

### SARA's Expansive Reach

12.     SARA  prohibits people released on parole, conditional release, or under post-release supervision who were convicted of sexual offenses involving minors or were designated risk level three pursuant to New York's Sexual Offender Registration Act ("SORA")[2] "from knowingly entering into or upon any school grounds."

13.     SARA is mandatorily imposed as a special condition of release on all designated individuals. The language of the imposed condition of release mirrors the language of Executive Law § 259-c (14) and Penal Law § 220.00 (14).

14.     Given that SARA's restriction is imposed as a condition of release, individuals are

---

[2] SORA requires that people convicted of enumerated offenses designated by state law as "sexual offenses" are required to undergo a risk assessment hearing prior to their release from prison. The risk levels that individuals can be designated are 1 (low), 2 (medium), 3 (high). The assessment process involves the use of a risk assessment instrument that is not empirically validated, based on antiquated, outdated science, and uses arbitrary weighing of factors.

not allowed to leave prison unless they state in writing that they have read the restriction, understand it and understand that any violation of the condition can be the basis of revocation and reincarceration. Individuals released under supervision are expected to "faithfully" comply with all conditions.

15.    Terms of release, like the restrictions imposed by SARA, can last for several years or, for individuals like plaintiff B.Z., for life. For individuals subject to SARA, this means years and potentially a lifetime of housing instability and fear of reincarceration.

16.    Under SARA, the banishment zone of "School Grounds" is defined expansively by references to subdivision fourteen of section 220.00 of New York's Penal Law. A school ground is "(a) in or on or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school or (b) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicle located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an 'area accessible to the public' shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants."

17.    In addition to the school ground prohibition, SARA also prohibits such individuals from knowingly entering into "any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present."[3]

---

[3] However, it does offer a limited exemption for individuals who are registered students of such facilities or institutions, employees of such facilities or institutions, or family members of people enrolled in such facilities or institutions insofar as they have the approval of both their parole officer and the head of the facility or institution and only for the limited purposes authorized by those individuals.

18.     Put together, individuals subject to SARA cannot knowingly enter into the real property line of a school, or any restaurants, stores, parks, parking lots, streets, or playgrounds within 1,000 feet of the real property line of a school, or any facilities or institutions primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present.

19.     DOCCS has further broadened this expansive reach by applying SARA to limit where subjected individuals can live despite the lack of such a restriction in the law's text. DOCCS does not allow subjected individuals to reside within 1,000 feet of the real property of a school.

**Urban Banishment Zones**

20.     The vastness of SARA's prohibition on knowingly entering spaces within 1,000 of a school ground uniquely interacts with urban environments to banish subjected individuals from large swaths of the cities in which they reside.

21.     Approximately 3,120,866 of 3,657,148, or 85.3 percent, of residential parcels in New York City are located on a property that is 1,000 feet or less from the property line of a school. Thus, they are off limits for anyone who must comply with SARA to reside in.



**SARA Residential Restrictions in New York City**
Residential parcels that are restricted -- 85.34%

6

22.     In Manhattan, 95.2 percent of residential parcels are restricted by SARA. 89.2 percent of residential parcels in the Bronx are restricted by SARA. 89.1 percent of residential parcels in Brooklyn are restricted by SARA, and 75.4 percent of residential parcels in Queens are restricted by SARA. About half of all parcels on Staten Island are restricted by SARA.

23.     Since SARA prohibits knowing entry into more than just residences, subjected individuals who enter into most areas of New York City for innocent and necessary purposes face the reasonable fear of reincarceration for violating their terms of release. For example, in New York City approximately 90 percent of all clinics and hospitals, 91 percent of soup kitchens or food pantries, and 88 percent of public libraries are located within 1,000 feet of a school.



**SARA Restrictions for Clinics and Hospitals**
1242 out of 1374 (90.4%) clinics and hospitals are restricted by SORA

not restricted
restricted

Of all clinics and hospitals in the NYC facilities database.

24.     In fact, a trip to this courthouse at 500 Pearl Street, New York, NY by the plaintiffs in this action would likely violate SARA because of its proximity to P.S. 001 Alfred E. Smith Elementary School, which is approximately 800 feet from the courthouse from the closet points of the respective buildings and Transfiguration School which is approximately 500 feet from the closet point of the courthouse.

## Uncertainties in Measurement

25.     Beyond being expansive, SARA also provides little guidance on how to measure the 1,000 feet restriction. This allows for inconsistent and arbitrary enforcement by DOCCS and parole officers who must approve that residences are SARA compliant before individuals subject to SARA can reside in those addresses.

26.     SARA's only description of how to measure 1,000 feet is that the starting point must be the real property line of a school. SARA is silent as to the second point of measurement. In other words, SARA does not fix whether the 1,000 feet restriction is measured from the property line of a school to the property line of a residence, or the property line of a school to the middle point of a residence, or the property line of a school to the door of a residence, or something else entirely. Apartments create further confusion. Is the measurement from the apartment unit itself or from some point on the perimeter of the apartment building? Given that every foot matters, these seemingly small distinctions have significant consequences. For example, if measured from the front door, one address plaintiff J.L. submitted would be 1,428.63 feet from a school, but if measured from the property line of the apartment, it would only be 1,123.43 feet from a school, a difference of over 300 feet.[4]

---

[4] J.L.'s parole officer rejected this address even though it appears to be over 1,000 feet from a school.

27.     Parole officers determine if a residence is compliant by using both a mapping program known as the Critical Infrastructure Response Information System ("CIRIS") and visual inspections conducted by the officers. Pursuant to DOCCS Directive #8700, parole officers "conduct a visual inspection by surveying the 1,000-foot area of the proposed residence in all directions, noting any SARA related issues or other supervision concerns (i.e., schools, daycares, parks, etc.)." After this visual check is done, a case conference with a supervising parole officer and the bureau commander occurs to approve or reject a proposed address.

28.     The choice to reject an address as non-SARA compliant based on visual inspections is discretionary and has led to residences being rejected for being too close to daycares and nursery schools, for a school being in the sightline of a residence regardless of whether it was 1,000 feet from the property line of a school, and often for no articulated reason at all.

29.     Individuals subject to SARA are not part of the visual inspection and case conference process and are often given no reason why an address was denied as non-compliant with SARA.

30.     Individuals subject to SARA do not have access to CIRIS and must cobble together other resources to compile addresses that they hope are compliant with the law. As a result of the opacity of this system and the statutory silence on measurement, subjected individuals are left guessing if a residence that appears more than 1,000 feet of a school ground will be deemed compliant by a parole officer.

31.     Individuals subject to SARA often seek help to try to obtain housing. In an effort to remedy homelessness, housing specialists at nonprofit organizations often provide such assistance. Those specialists use publicly available online maps to see if available apartments are

more than 1,000 feet from schools. These specialists take significant time and effort cobbling together information to get their clients placed, almost always without success.

32.    The addresses these caseworkers identify and submit with their clients, which they believe are compliant, are often rejected. Parole officers rarely provide any explanation for why an address has been denied, leaving the caseworkers without information they would need to better tailor their search. As a result of SARA and its confusing enforcement, it often takes years for housing specialists to find housing for individuals, if they are able to at all.

33.    The uncertainties of SARA's text also fundamentally undermines the certainty of where restricted individuals can travel. SARA is silent as to what exactly the statute means for a prohibited location to be "within" 1,000 feet of a property line of a school. This creates confusion for places that are only partially within banishment zones. For example, does a portion of a park being within 1,000 feet of the property line of a school mean that the whole park is off limits or just the portion near the school? Does a portion of a store being within 1,000 feet of the property line of a school mean that just that portion of the store is off limits while the other portions can be entered? Plaintiffs face unmanageable uncertainty in their day-to-day lives due to these ambiguities.

**Uncertain and Unpredictable Enforcement**

34.    DOCCS and parole officers have not narrowed or further defined SARA's restrictions through policy or enforcement.

*Discretion in Enforcement*

35.    Parole officers exercise an enormous amount of discretion in determining how SARA restricts where subjected individuals may reside and move throughout their communities.

36.    DOCCS has told parole officers to use their own "sound judgment" and "common sense" to determine whether entry onto a particular property violates SARA. DOCCS has also declared that "loitering in a place knowing it to be close to school property may be a deemed a violation of the SARA condition." Some factors that officers have been told to consider when determining whether a violation has occurred are "whether the entry was intentional, the proximity to the school, the purpose of the entry, whether there was contact with minors, whether the entry was an incidental and isolated incident, or recurring and suspicious, whether the Parole Officer had been notified, and whether the Parole Officer had previously warned the releasee or had granted permission for entry."

37.    On information and belief, there are no official directives from DOCCS limiting enforcement to these factors. Further, this information is not provided in writing to individuals who are subject to SARA.

38.    This enforcement discretion leaves many subjected individuals with little clarity as to where they are lawfully permitted to go in their community without risking reincarnation. Subjected individuals are left at the whims of their parole officers.

*Inconsistencies in Enforcement*

39.    Over the years that SARA has been in place, DOCCS has shifted its official enforcement positions concerning SARA.

40.    In state court litigation, DOCCS has sometimes stated that SARA "prohibits offenders from residing within 1,000 feet of a school" with no mention of restrictions on movement. It has also claimed "SARA not only prevents high-risk convicted sex offenders from living near schools – it also prevents them from knowingly accessing areas near schools whether or not they live there" and that "subject individuals cannot live or travel within 1,000 feet of a

11

school, but can live and travel near other, unidentified sites, just not enter them."

41.    In April 2018, DOCCS's Office of Counsel told a public defender organization that SARA was a residency restriction only. However, recently in a case before the Kings County Supreme Court called *In re Devine*, the Office of the Attorney General stated in an affirmation that limiting SARA to a residency requirement "would frustrate the language and intent of the statute" and that SARA prohibits knowing entry into certain places at the discretion of individuals' parole officers.

42.    DOCCS has also taken inconsistent positions regarding daycare centers. In the past, parole officers have rejected addresses based on the proximity to daycare centers as demonstrated by the facts of a 2013 Queens County Supreme Court case called *Cummings v. New York State Div. of Parole, Queens III Field Off.* There, the Attorney General stated to the court that the "residences of petitioner's mother and father were rejected because day care facilities were located within 1000 feet of each residence." In March 2019, DOCCS issued a memorandum declaring that in approving addresses, staff were required to check for daycare centers within 1,000 feet of a proposed address. However, in the very same document, DOCCS also stated that SARA does not include daycare centers. DOCCS has simultaneously claimed that SARA does not cover daycares but can be enforced as if it does. This has led to arbitrary enforcement where some people subject to SARA have had housing rejected due to the proximity to a daycare and some people subject to SARA live in buildings that contain daycares.

43.    The lack of clear and consistent definitions has created a system where many parole officers have come up with their own interpretations of SARA. Some parole officers tell individuals subject to their supervision that SARA only limits where they can reside and say nothing about movement. Others tell individuals that SARA limits where they can reside but only

limits how long they can stay in an area around a school or the times of the day that they can go into the area around a school. Still others are much stricter. Individuals subject to SARA receive conflicting information from different sources, and, unable to gain clarification, live in fear of being subject to parole violations for traveling through their city.

### State-Imposed Homelessness

44.    Many individuals first encounter SARA when they are about to be released from prison. Because DOCCS has a policy of not releasing individuals subject to SARA unless they provide a compliant address, subjected individuals must rush to find housing or face prolonged detention. Many subjected individuals cannot live with family members who would otherwise be willing to take them in because their family members do not live in SARA-compliant homes.

45.    Due to federal regulations, people convicted of sexual offenses who are deemed a risk level two or three are permanently banned from public housing. As discussed earlier, most private housing is off limits in urban areas because it is within 1,000 feet of a school. Finally, even for subjected individuals who overcome these hurdles, landlords are often unwilling to rent their residences to people convicted of sex offenses after paroles officer notify them of their conviction status. For working class and poor individuals, these barriers are too high. Their only option is homelessness.

46.    Accordingly, individuals subject to SARA who were granted parole or hit their conditional release date and cannot find compliant housing are kept in prisons until they obtain housing, usually when a shelter bed opens up, or until their term of supervised release ends.

47.    For the individuals who eventually make it out of prison, they only fare marginally better. They often have to live in halfway homes or homeless shelters for years because they cannot find any other compliant housing. Many of the SARA-compliant men's shelters in New York City

are on Wards Island. The Wards Island shelters are in abhorrent condition. They are infested with cockroaches, mice, and flies. Raw sewage has been found flooding a basement, black mold has been observed along walls, and the interior temperatures sometimes force shelter residents to sleep in coats.[5] As one resident put it, "This place does not foster growth and development . . . It fosters death and destruction."[6]

48.     The few compliant shelters outside of Wards Island in New York City also are in horrid conditions, where they are exposed to the risk of physical and sexual violence.[7]

49.     Subjected individuals living in these shelter environments want to reintegrate into society safely and productively. But the chaos, violence, and physical toxicity they experience daily in these shelters undermines their efforts, making it harder to work towards extremely rare housing and employment opportunities. Multiple class members report that being stuck in these homeless shelters feels no different than being in prison.

**SARA Does Not Protect Minors and Is Unnecessary**

50.     In 2000 when SARA was enacted, it originally applied only to individuals who had actually been convicted of an enumerated offense against a minor, and it only prohibited those individuals from actually going inside the boundary line of a school. Subsequently, in 2005 SARA was significantly expanded to the current language. The stated justification for the expansion was to protect minors.

---

[5] Greg B. Smith, *Woes at Wards Island Homeless Shelters Overseen By Gov. Cuomo's Sister*, The City (May 31, 2019), https://www.thecity.nyc/2019/05/31/woes-at-wards-island-homeless-shelters-overseen-by-gov-cuomo-s-sister/.

[6] Steven Vago & Jorge Fitz-Gibbon, *NYC Officials, Residents Rip Conditions At Wards Island Homeless Shelte*r, N.Y. Post (Aug. 30, 2021), https://nypost.com/2021/08/30/nyc-officials-residents-rip-conditions-at-wards-island-homeless-shelter/.

51.     However, because SARA categorically applies to all people designated risk level three, many subjected individuals have never committed offenses against minors. Further, because some of the "sexual offenses" enumerated by statute do not require any sexual contact or sexual motive, some people, like M.G., who are subject to SARA have never been convicted of offenses of a sexual nature. Even of the people who have been convicted of sexual offenses against minors, the vast majority have not committed an offense against a minor who is a stranger and have not committed an offense that in away way involves proximity to a school.

52.     Additionally, contrary to the stated purpose of that expansion, over twenty years of social scientific research into geographic restrictions on people convicted of sexual offenses has failed to find any correlation between such restrictions and reducing sexual recidivism.[8] No evidence exists to support the hypothesis that people convicted of sexual offenses who live within closer proximity to schools, parks, and playgrounds have an increased likelihood of sexually recidivating.[9] In New York State, Dr. Kelly Socia "compared monthly rates of arrests for recidivist and non-recidivist sex crimes against both children and adults, comparing different counties with and without residency restrictions, and comparing the same counties before and after their residency restriction law was implemented." After reviewing 12 years of data, Dr. Socia concluded that "New York's county-level restrictions had no impact on the types of crimes they were

---

[8] See Paul A. Zanderbergen, Jill S. Levenson & Timothy C. Hart, *Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism*, 37 Crim. Just. & Behav., 482, 482 (2007) ("There was no significant relationship between reoffending and proximity to schools or daycares. The results indicate that proximity to schools and daycares, with other risk factors being comparable, does not appear to contribute to sexual recidivism. These data do not support the widespread enactment of residential restrictions for sex offenders."); Beth M. Huebner, Kimberley R. Kras, Jason Rydberg, Timothy S. Bynum, Eric Grommon & Breanne Pleggenkuhle, *The Effect and Implications of Sex Offender Residence Restrictions: Evidence from a Two-State Evaluation*, 13 Criminology & Pub. Pol'y, 1, 22 (2014) ("Even with a narrowed focus to sex offenders with child victims, this research suggests that residence restrictions might not accomplish the aims it hopes to achieve.").

[9] See Jill S. Levenson, Kristen Zgoba & Richard Tewksbury, *Sex Offender Residence Restrictions: Sensible Crime Policy or Flawed Logic?*, 71 Fed. Prob. 2 (2007).

designed to combat." Studies in Minnesota, Colorado, Florida, and North Carolina have all reached the same conclusions about those state's restrictions.[10]

53.    The fundamental problem with SARA and similar geographic restrictions is that they are premised on myth and stereotypes rather than an accurate understanding of how sexual offending against minors occurs. Geographic restrictions are based on the notion that people who commit sexual offenses are likely to enter into school grounds to find victims. Evidence does not support this conclusion. As the Center for Disease Control and Prevention states, "about 90% of child sexual abuse" is perpetuated by "[s]omeone known and trusted by the child or child's family members."[11] Child abductions are similar. A federal study cited by the FBI showed that "only an estimated 0.0068 percent were true kidnappings by a stranger."[12]

54.    The next myth underlying SARA is that people who commit sexual offenses have dangerously high levels of sexual recidivism. Decades of research has dispelled this myth. Research has consistently shown that people who commit sexual offenses recidivate at a significantly lower rate than many other categories of offenders.[13]

55.    Given that SARA is disastrous to rehabilitation and unhelpful for crime prevention, automatically imposing such an expansive restriction on thousands of people, many of whom have

---

[10] Minn. Dep't. of Corr., *Residential Proximity & Sex Offense Recidivism in Minnesota* (Apr. 2007); Colo. Dep't. of Pub. Safety Div. of Crim. Just. Sex Offender Mgmt. Bd., *Report on Safety Issues Raised by Living Arrangements for and Location of Sex Offenders in the Community* (2004); Matt R. Nobles, Jill S. Levenson & Tasha J. Youstin, *Effectiveness of Residence Restrictions in Preventing Sex Offense Recidivism,* 58 Crime & Delinq., 491 (2012); Songman Kang, *The Consequences of Sex Offender Residency Restriction: Evidence from North Carolina*, Int'l. Rev. of L. and Econ., 49 Elsevier10 (2017).

[11]*About Child Sexual Abuse*, Centers for Disease Control and Prevention (Apr. 6, 2022), https://www.cdc.gov/child-abuse-neglect/about/about-child-sexual-abuse.html?CDC_AAref_Val=https://www.cdc.gov/violenceprevention/childsexualabuse/fastfact.html.

[12] Dept. of Just. Office of the Inspector Gen., *Audit Report 09-08: The Federal Bureau of Investigation's Efforts to Combat Crimes Against Children* (Jan. 2009), https://oig.justice.gov/reports/FBI/a0908/chapter3.htm.

[13] Roger Przybylski, Sex Offender Mgmt. Assessment and Plan. Initiative, *Recidivism of Adult Sexual Offenders*, (July 2015).

16

never committed a sexual offense against a child and pose no realistic risk to do so, is illogical. This is especially the case because DOCCS maintains the ability to impose restrictions individually tailored to prevent offending by the rare individual who actually poses a risk to misuse their proximately to a school to offend. As New York's parole regulations state, "A special condition may be imposed upon a releasee either prior or subsequent to release. . . . Each special condition may be imposed by a member or members of the Board of Parole, an authorized representative of the Division of Parole, or a parole officer." N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.3.

**The Named Plaintiffs Have Been and Continue to Be Injured by SARA**

*M.G.*

56.     Plaintiff M.G. is a 52-year-old Black resident of Wards Island in New York County, NY. He has been married to his wife for 22 years and has five children. He has worked as an outreach worker and violence interrupter, and regularly volunteers at his father's church. His family remains an extremely important part of his life.

57.     M.G. is required to comply with SARA. M.G. currently lives in a homeless shelter on Wards' Island hours away from his family on Staten Island.

58.     For most of his life, M.G. has been a fixture of his community on the North Shore of Staten Island. As the son of a minister, M.G. always valued community service. When he was young, M.G. and his coworkers set up mentoring programs and programs to support survivors of domestic violence and sexual assault. In 2011, after his friend was killed, M.G. helped start a community violence interruption program that he worked with for seven years. This program involved regular outreach to people in the community to provide mental health support and to de-escalate interpersonal conflict. Throughout his life, he has volunteered at churches, supported

community members, and created programs to address gaps in the social safety net to help his neighbors.

59. In 2018, due to intoxication, lack of sleep, and anxiety, M.G. had a mental breakdown in the hallway of a friend's building that resulted in him having a confrontation with several minors and grabbing one of them. His actions were not sexual in nature and involved no sexual motivation. After trial in 2019, he was convicted of attempted kidnapping in the second degree, unlawful imprisonment in the second degree, and endangering the welfare of a child. Prior to release, M.G. was designated a risk level 3.

60. In 2024, M.G. was granted parole for his good behavior in prison. Just prior to his stated release date, DOCCS informed M.G. that he would be subject to SARA. DOCCS also imposed conditions on M.G. preventing him from living with his wife and family. Given SARA and the additional conditions, he had to scramble to find SARA-compliant housing on short notice. He could not, and DOCCS held M.G. in prison for approximately six weeks past his release date. M.G. was eventually released once a bed in a homeless shelter on Wards' Island became available.

61. Since his release, M.G. has lived in several New York City shelters. Because he is on Wards Island and his family lives on the North Shore of Staten Island, he has to travel about four hours round trip to and from his shelter nearly every day in order to see them.

62. M.G. would like to live closer to his family on the North Shore of Staten Island but SARA has prevented him from finding a compliant address in that area. The North Shore of Staten Island is twice as dense as the rest of the island and has a similar density to some neighborhoods in other New York City boroughs. As a result, finding SARA-compliant housing in the area is extremely difficult. For example, while incarcerated, his family submitted his father's address, which they believed was SARA-compliant, to his parole officer, who ultimately rejected the

address as non-compliant. Since M.G.'s release, he has tried to find affordable apartments near his family that seem likely to comply with SARA but has been unsuccessful.

63.    SARA impacts M.G.'s ability to commute to see his family and prevents him from moving around his community. His parole officer told him that due to SARA, being in a school zone or near children could result in re-incarceration. As a result, he avoids spending any time near school zones or other places where children congregate. Due to the fear of violating SARA, M.G. no longer volunteers regularly to help his community. M.G.'s father's church on Staten Island is approximately 300 feet from an elementary school, and he limits the time that he is at the church for fear he will be violated. For example, he never helps with events outside of the church building when school is in session or children may be present and avoids being in church while people are inside. He has also avoided helping out at his father's church soup kitchen because of the proximity to a school.

64.    To start his two-hour journey from Staten Island back to his shelter, M.G. walks several minutes out of his way to wait at a bus stop for a different bus line than he would normally take, since his normal stop appears to be approximately 1,000 feet from a public school under some measurements and over 1,000 feet from on other measurements. Because he can see a school near the stop, he avoids it entirely even though he is uncertain if its location actually violates SARA. He worries that waiting too long for the bus could result in a violation. He lives in fear that mundane, innocent activity necessary for daily living, like traveling to and from his shelter, will result in re-incarceration and further separation from his family.

65.    Whenever M.G. gets out of the subway in Manhattan, he fears that he is violating SARA because there are often schools everywhere. For example, M.G. was invited to have lunch with a cousin in Manhattan, but when he got off the train, he saw a school, tried to leave the area,

and saw another school. Panicked, he walked away from the schools and entered a store to wait until his cousin was able to pick him up in his car. In another instance, after a meal, a family member proposed spending time in a park in Manhattan. He refused out of fear that going to the park would violate SARA.

66.    SARA's residency and movement restrictions, and DOCCS's lack of clarity around the meaning of the law and its enforcement cause M.G. intense daily anxiety. He has never committed a sexual offense, but the law, which is mandatorily applied to him, is the biggest barrier between him and successful reintegration.

*B.Z.*

67.    B.Z. is a 68-year-old Black man who, because of the SARA restrictions, currently resides in a homeless shelter in the Bronx, NY. As a child, B.Z. experienced poverty, violence, and trauma. He saw no opportunities for growth and struggled with anger that ate away at him. He lacked tools to address those challenges. His only guidance came from his older peers, who often acted with violence.

68.    Forty years ago, in 1984, B.Z. was convicted of rape in the first degree, sodomy in the first degree, and robbery in the first degree against an adult victim. In the mid-1970s B.Z. had previously been convicted of rape offenses against adults. He has never been convicted of sexual offenses involving minors. In 1984, B.Z. was sentenced to a term of 15 years to life in prison.

69.    While in prison, B.Z. came to terms with the harm he caused his victims and their loved ones. He took anger management and alternatives to violence programs. He used the tools he learned in these programs to recognize his triggers and manage his response to challenging interactions. Realizing that his peers influenced his behavior, he began spending time with people

who processed their emotions more effectively and learned from them. He learned to pause and assess before reacting to negative stimuli. These approaches have helped him live a peaceful life.

70.    B.Z. also used his time in prison to further his educational and spiritual opportunities. He took courses in psychology, sociology, history, accounting, and comparative religion. He loved those courses and learned as much as he could. In prison, B.Z. became more devoutly religious and spirituality now helps immensely.

71.    While incarcerated, B.Z. saw that young people in prison struggled in the same way he had, so he and others in his religious community proposed a Big Brother program that DOCCS approved. B.Z. led the program as one of the peer mentors, creating space for young people address their trauma and work through their own challenges more productively.

72.    B.Z. learned a variety of trades to prepare himself for a productive, fulfilling life upon release. He worked nearly every job in the kitchen and fell in love with cooking.

73.    B.Z. was released from prison in 2022 after serving 39 years in prison. For the duration of his period of supervised release, B.Z. is required to comply with SARA.

74.    Given that he could not find a compliant address, B.Z. went to the live at the shelter on Wards Island and then to a shelter in the Bronx. At the shelter, people are disrespectful and noisy, and the chaos often makes it very challenging to sleep. At 68 years old, after sharing prison cells and shelter rooms with other men for many decades, all B.Z. wants is his own space to rest and to call his own.

75.    Since his release in 2022, B.Z. has been trying to move to an apartment. Caseworkers have helped him review hundreds of apartments to find potentially compliant addresses. He has supplied his parole officer with over 20 of these seemingly compliant addresses.

Nevertheless, his parole officer rejects most of the addresses as non-compliant, often without providing any further explanation.

76.    For example, B.Z. submitted the following addresses for approval:

- 203 Sullivan Place, Brooklyn, NY 11225, which is approximately 1,333.38 ft from closest school conservatively measured from property line to property line;

- 9602 4th Ave, Brooklyn, NY 11209, which is approximately 1,130.78 ft from closest school conservatively measured property line to property line.

77.    On information and belief, B.Z.'s parole officer rejected both of these addresses as non-compliant.

78.    B.Z.'s caseworker has worked with clients whose addresses were rejected because, for example, the apartment was compliant, but the yard was not. Parole officers provide no uniform guidance to help her, or other caseworkers, assist their clients with the housing process. Even when an address is deemed compliant by CIRIS, the visual inspection review process often takes weeks, by which time the apartment is no longer available.

79.    B.Z.'s disability has further complicated his apartment search. For months, B.Z. has been dealing with significant back and leg pain, and he uses a walker to move around. He is seeking diagnosis and treatment, but for now, his mobility is impaired indefinitely. To accommodate his disability, he needs an apartment that is either on a ground floor or that has elevator access, in a building located within a few blocks of an accessible subway station. His attempts to find SARA-compliant apartments that meet these accessibility requirements have failed, and he has almost given up on finding promising addresses to submit for approval.

80.    B.Z. has received mixed messages about the scope of SARA's movement restriction from his parole officers. His first parole officer told him that the SARA condition meant

that he cannot go near children in any context. After he was transferred to a new parole office in the Bronx, he was told that SARA is only a residency restriction. Because of this mixed guidance and the unclear text of the law itself, B.Z. is not sure whether regular behavior could result in his re-incarceration under the law.

81.    Because SARA is both extremely restrictive and extremely vague, B.Z. has remained stuck in a shelter for years with no end in sight.

*J.L.*

82.    J.L. is a 61-year-old Latino man who because of SARA must reside in a homeless shelter in the Bronx, NY. He is a U.S. Army veteran who received an honorable discharge after nine years of service. While in the military, J.L. earned a bachelor's degree and later worked for 12 years as a medical lab technician. Today, he works as a paralegal for a non-profit legal organization that seeks to exonerate people who have been wrongfully convicted. He has dedicated himself to this work, recently graduating from a paralegal training program at Columbia University.

83.    Nearly thirty years ago, in May of 1996, J.L. was convicted of convicted of two counts of rape in the first degree and two counts of sexual abuse in the first degree for actions involving his minor daughter. He was sentenced to a term of $16\,^2/_3$ to 40 years and served 27 years in prison.

84.    While in prison, J.L. assisted many other incarcerated people as they navigated their legal issues. These included cases involving family law, civil-rights claims, federal habeas petitions, and motions to vacate judgments.

85.    For the duration of his period of supervised release, J.L. is required to comply with SARA. After he reached his conditional release date on March 7, 2022, J.L.'s incarceration was

extended as he searched for SARA-compliant housing in New York City. For eight months, J.L. experienced anguish and frustration until he was finally sent to a SARA-compliant Bronx homeless shelter. He was released in November of 2022.

86.     J.L. currently lives in a homeless shelter in the Bronx. In the shelter, J.L. faces unhygienic and chaotic conditions. He frequently witnesses violence and substance use near his living space. His freedom is also substantially constrained. He is restricted in the food, drinks, and personal items he is allowed to keep while in the shelter and faces constant surveillance from facility staff. After decades of incarceration, J.L.'s experience in the shelter is very similar to his life in prison.

87.     SARA has made it virtually impossible for J.L. to obtain an apartment. Since his release, J.L. has submitted dozens of addresses to his parole officer for approval. J.L. believes that many of these addresses are more than 1,000 feet from a school. J.L. reached this conclusion by using several different online mapping tools to estimate the distance of each address from nearby schools.

88.     For example, J.L. has submitted the following addresses which seem to be over 1,000 feet from the nearest school using the most conservative possible measurement from property line to property line:

- 730 St. Ouen Street, Bronx, NY 10470, which is located 1,620.73 ft from the closest school;

- 10-45 Mcbride Street, Far Rockaway, NY 11691, which is located 1,215.07 ft from the closest school;

- 185-11 140th Avenue, Springfield Gardens, NY 11413, which is located 1,123.43 ft from the closest school;

- 1102 Clarence Avenue, Bronx, NY 10465, which is located 1,815.67 ft from the closest school;

- 1594 Unionport Road, Bronx, NY 10462, which is located 1,898.32 ft from the closest school;

89.     J.L.'s parole officer rejected all of these addresses. J.L. believes that his parole officer rejected these addresses because they did not comply with SARA, but the parole officer has provided J.L. with no explanation why they were denied.

90.     This uncertainty has made it extremely difficult for J.L. to navigate the housing market, as he does not know which apartments his parole officer will reject. For instance, on information and belief, some of the apartments J.L. has submitted were rejected because of their proximity to daycare centers, even though they are well over 1,000 feet from a school. Accordingly, J.L. has no way of identifying potentially compliant apartments to submit for approval, since enforcement of his parole conditions appears to depend on the unique interpretation of his parole officer.

91.     SARA has severely inhibited J.L.'s efforts to be a reliable and productive employee, establish stable relationships, and successfully reintegrate himself into his community. Because J.L. has been unable to move out of the shelter, he does not have consistent access to the internet, nor does he have a private space where he can conduct confidential paralegal work. Additionally, if J.L. does not return to his shelter by 11 pm, he will lose his bed. This hinders J.L.'s ability to work the long hours required by his job. He is also unable to build friendships or establish relationships because he lacks private space.

92.     As J.L. continues to commit his working life to serving others, he is working to rebuild his own life as well. SARA poses a nearly insurmountable obstacle to achieving that goal.

It prevents J.L. from obtaining safe and stable housing, establishing vital interpersonal relationships, and fully devoting himself to his profession.

*J.M.*

93.     J.M. is a 67-year-old resident of Albany, NY. He was born and raised in New York City along with his four sisters, seven brothers, and 13 aunts and uncles. J.M. spent his career in New York City working as a bank supervisor, a real estate developer, and in construction. Now in Albany, he has spent nearly two years learning about his new community and working to build a home.

94.     In 2013, J.M. was convicted of two counts of sexual misconduct against a family member minor. He was sentenced to ten years in prison and ten years of supervised release.

95.     While incarcerated, J.M. took courses to become a teacher and later taught math, English, and anger management classes to other incarcerated men. Due to his exceptional record while in prison, J.M.'s sentence was shortened for good behavior, and he was scheduled to be released from prison in November of 2021.

96.     Yet because J.M. was subject to SARA, he struggled for months to find a compliant home to which he could be released. He searched for housing in at least four different counties, submitting at least six apartments to his Offender Rehabilitation Coordinator. Each apartment was rejected. While incarcerated, J.M. had extremely limited access to the information needed to identify available apartments, contact landlords, and determine whether the address complied with his parole conditions. Still, DOCCS did not provide J.M. with any assistance locating housing. Instead, DOCCS held J.M. for six months past his initial release date of November 2021. J.M. experienced stress, frustration, and despair when, after eight years in prison, his incarceration was extended indefinitely. It was not until May of 2022 that he was finally released.

97.    Since his release, and for the duration of his period of supervised release, J.M. is required to comply with SARA. J.M. has repeatedly confirmed with his parole officer that his terms of supervised release prohibit him from going within 1,000 feet of a school or public park, or any other area classified as "school grounds" as defined by SARA.

98.    These conditions burden J.M. on a daily basis. He makes significant changes to his daily routine in an effort to comply with SARA. For example, J.M. has altered the bus routes he takes to avoid entering any area within 1,000 feet of the real property line of any schools or having accidental interactions with minors.

99.    A large proportion of the City of Albany qualifies as school grounds pursuant to SARA. J.M. is unable to accurately identify the precise areas he must avoid. Accordingly, J.M. will not visit or walk by the City's parks because he is unsure if they are restricted by SARA. J.M. would like to go to Washington Park in Albany but he is unsure if the park is restricted, or if some portion of the park is restricted and what that portion is. Due to ambiguity in the definition of "school grounds" under SARA, J.M. avoids entering large swaths of the City of Albany for fear of violating his parole conditions.

100.    On more than one occasion, J.M. has refrained from visiting a medical professional because he was not certain whether doing so would require violating SARA. J.M. now travels forty minutes outside of Albany to visit his primary-care doctor in order to avoid potentially violating his SARA restrictions.

101.    These precautions take a significant toll on J.M.'s mental health and cost him time and energy as he has works to establish a stable life after being released from prison.

102.    Moreover, the uneven and inconsistent enforcement of SARA has caused J.M. to experience serious housing instability. Prior to his release in May 2022, J.M. received approval to

move into a one-bedroom apartment on Clinton Avenue in Albany, NY. He resided in this apartment until January 2024, when he was informed by his parole officer that his residency was no longer SARA compliant. J.M. was informed by his parole officer that a new school had opened within 1,000 feet of his apartment, rendering his address non-compliant. However, on information and belief, no school has opened within 1,000 feet of this address since it was approved prior to J.M.'s release from prison.

103.    J.M. worked tirelessly for nearly two years to establish stability and security in his new home, only to have his new life upended by a seemingly arbitrary reclassification of his apartment. Due to this sudden change in the status of J.M. 's residence, J.M. was informed that he was not permitted to be in his apartment between six p.m. and six a.m. As a result, with only several days' notice, he was forced to sleep in a homeless shelter while he searched for a new apartment. On the first night J.M. was staying in a shelter, the stress of being suddenly forced to leave his home caused him to suffer a cardiac episode requiring overnight hospitalization.

104.    In the days that followed, J.M. experienced severe emotional distress as he tried to avoid homelessness and comply with his parole conditions. At considerable time, energy, and expense, J.M. was able to locate a new compliant apartment. This ordeal cost J.M. over $3,000 in out-of-pocket expenses. Due to the strain of frantically attempting to locate a new apartment, J.M. did not have the opportunity to safely recover from the cardiac episode he suffered.

105.    Taken together, SARA has harmed J.M.'s mental, financial, and physical health and has been a barrier to his successful reintegration into society.

## CLASS ALLEGATIONS

106.    Plaintiffs M.G., B.Z., J.L., and J.M. bring this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

107.    Plaintiffs M.G., B.Z., J.L., and J.M. seek to represent the following class:

A class of all people who are or will be subject to the requirements
of New York Executive Law § 259-c (14).

108.    Plaintiffs M.G., B.Z., and J.L. seek to represent the following subclass:

A subclass of all people residing in or will reside in New York City who are or will
be subject to the requirements of New York Executive Law § 259-c (14).

109.    Plaintiffs M.G., B.Z., J.L., and J.M. are adequate representatives of the proposed
class and subclass.

110.    The proposed class and subclass satisfy the requirements of Rule 23(a)(1) because
the class is so numerous that joinder of all members is impracticable. Hundreds are within the class
and subclass, and many more will become class members during this litigation.

111.    The class and subclass meet the commonality requirements of Federal Rule of Civil
Procedure 23(a)(2). All members of the class are subject to the requirements of Executive Law
§ 259-c (14). The lawsuit raises numerous questions of law common to members of the proposed
class, including whether the law is facially constitutional and whether it violates class members'
rights under the Fourteenth Amendment.

112.    The class and subclass meet the typicality requirements of Federal Rule of Civil
Procedure 23(a)(3) because Plaintiffs M.G., B.Z., J.L., and J.M.'s claims are typical of the claims
of the class. Plaintiffs M.G., B.Z., J.L., and J.M. and the proposed class members are all subject to
the requirements of Executive Law § 259-c (14) by statute. Plaintiffs M.G., B.Z., J.L. and J.M. and
the proposed class share the same legal claims, which assert the same rights under the Fourteenth
Amendment to the United States Constitution.

## JURISDICTION AND VENUE

113.    This Court has subject-matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

114.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the plaintiffs' M.G., B.Z. and J.L.'s claims occurred in this district and because defendant DOCCS maintains at least one office in this district.

## CAUSE OF ACTION

115.    Defendants' actions violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that this Court:

A.    Assume jurisdiction over this matter;

B.    Certify a class of all people who are or will be subject to the requirements of New York Executive Law § 259-c (14) and a subclass of all people residing in or will reside in New York City who are or will be subject to the requirements of New York Executive Law § 259-c (14);

C.    Declare Executive Law § 259-c (14) facially unconstitutional;

D.    Declare that the application of Executive Law § 259-c (14) to M.G., B.Z, J.L., J.M., the class and the subclass is unconstitutional in violation of the Fourteenth Amendment to the United States Constitution;

E.    Enjoin the defendants from enforcing Executive Law § 259-c (14);

F.    Award the plaintiffs attorneys' fees and costs; and

G.    Grant any other relief the Court deems appropriate.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION


Daniel R. Lambright
Kathryn Sachs
Rubin Danberg Biggs*
Molly K. Biklen
125 Broad Street
New York, New York 10004
Phone: (212) 607-3300
dlambright@nyclu.org
ksachs@nyclu.org
rbiggs@nyclu.org
mbiklen@nyclu.org


Dated: May 28, 2024
       New York, NY


* Admission to the SDNY pending.